No. 04-623

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 188

STEPHEN C. KELLOGG,

       Plaintiff and Appellant,

  v.

DEARBORN INFORMATION SERVICES, LLC,
a Montana Limited Liability Company,

       Defendant and Respondent.

APPEAL FROM:    The District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDV 2001-0689,
Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Thomas A. Budewitz, Attorney at Law, Helena, Montana

       For Respondent:

              Jack R. Tuholske, Tuholske Law Office, Missoula, Montana

                      Submitted on Briefs:  May 3, 2005

                                Decided:  July 28, 2005

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Stephen Kellogg appeals from the District Court's adoption of the Referees' report partitioning the property he jointly owns with Dearborn Information Services (Dearborn). We affirm.

¶2 We address the following issues on appeal:

¶3 1. Whether the District Court had the power to impose a servitude forbidding building on parts of the partitioned property.

¶4 2. Whether the District Court's findings of fact are sufficient to support the imposition of building restrictions.

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 This action involves a tenancy in a rural valley–the Joslin Basin–in Lewis and Clark County. Kellogg and Dearborn own the property as tenants-in-common, having purchased it from the late Bruce Nelson in October 2000. A married couple, Joe Campbell and Tani Converse, own Dearborn. At one time Nelson owned much of the land in the valley, which he carved-up into haphazardly shaped small holdings. Nelson sold a great number of these holdings, creating a community of dozens of summer and permanent homes in the pristine valley. This hodgepodge of properties, and the difficulties that arose in recording them and locating easements to the various properties, created what the Referees characterized as a "Title Company's nightmare." The tenancy at issue is what Dearborn aptly describes as "a swiss-cheese like remainder parcel" of a little over 600 acres and 25 tracts.

2

¶6 Kellogg and Dearborn jointly purchased the tenancy with the intention of dividing it between themselves. Both live in homes on, or surrounded by, the property. Negotiations between the neighbors quickly broke-down and relations soured. In this acrimonious context, Kellogg brought suit against Dearborn in November 2001, requesting that the District Court partition the property. The District Court thereafter appointed referees pursuant to § 70-29-202(1), MCA, and ordered the Referees to survey the property and make a report recommending how best to divide it between the two tenants-in-common.

¶7 Surveying the property proved to be quite an undertaking as many of the public records describing it turned out to be incorrect. After a great deal of effort in establishing exactly what land was, and was not, a part of the property, the Referees settled on a plan of division. Most of the details of the plan are not relevant to this opinion. The dividing line between the two halves of the property for the most part follows Joslin Creek, which runs through a meadow separating the two parties' residences. The one recommendation that Kellogg objects to on appeal is the Referees' proposal to impose "no build" zones on sections of each half, including much of the aforementioned meadow. In their report the Referees stated the following regarding the "no build" zones: "No <u>residential</u> structures nor <u>permanent agricultural</u> structures (excepting fences, corrals or stock water facilities) should be built in these areas. These restrictions should appear in the deeds to these tracts and should be clearly identified in new Certificates of Survey and/or retracement Surveys." (Emphasis in original.) The Referees' stated reasons for the "no build" zones are that they should "reduce the need for any new permanent service roads and alleviate future discord."

As to the effect the restrictions will have on the value of the property, the Referees stated that they "concurred that neither party's ownership would be significantly diminished in value through such prohibitions."

¶8 Kellogg challenged the "no build" restrictions, asking the court to reject the Referees' recommendation. He argued that the Referees do not have the power to recommend such a restriction in a partition action. The District Court disagreed and adopted the Referees' report in its entirety. Kellogg now appeals the court's imposition of the "no build" zones.

STANDARD OF REVIEW

¶9 When the referees in a partition action submit their report to the district court, the court "may confirm, change, modify, or set aside the report . . . ." Section 70-29-212, MCA; *Tillett v. Lippert* (1996), 275 Mont. 1, 6, 909 P.2d 1158, 1160. This Court reviews the district court's findings of fact in a partition action to determine whether they are clearly erroneous. *Troglia v. Bartoletti* (1994), 266 Mont. 240, 244, 879 P.2d 1169, 1171. A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if a review of the evidence leaves this Court with the firm conviction that a mistake has been made. *Troglia*, 266 Mont. at 244, 879 P.2d at 1171. We review the district court's conclusions of law to determine whether they are correct. *Flood v. Kalinyaprak*, 2004 MT 15, ¶ 14, 319 Mont. 280, ¶ 14, 84 P.3d 27, ¶ 14.

**DISCUSSION**

**ISSUE ONE**

¶10 *Whether the District Court had the power to impose a servitude forbidding building on parts of the partitioned property.*

¶11 Kellogg asserts that the District Court did not have the power to impose "no build" zones on the partitioned property. He points out that neither he nor Dearborn requested such a servitude in their pleadings. Additionally, he argues that the only statutory power given to referees (and thus to the district court) to impose a servitude on a party to a partition proceeding is the power to create roads. Section 70-29-205(2), MCA, allows referees to "set apart a portion of the [partitioned] property for a way, road, or street . . . ." Since the servitude in question here is not a "way, road, or street," Kellogg reasons that neither the Referees nor the court possesses the power to impose a "no build" zone.

¶12 In addition to § 70-29-205(2), MCA, however, stands § 70-29-209, MCA. That statute states that when a partition cannot be made equally–that is, when it is not feasible to award each tenant-in-common an equal section of the property–the court "may adjudge compensation to be made by one party to another on account of the inequality . . . ." This refers to the ancient practice of owelty, through which a court avoids ordering a partition by sale when a property cannot be equally divided. *See Kravik v. Lewis* (1984), 213 Mont. 448, 455, 691 P.2d 1373, 1376. Section 70-29-209(2), MCA, grants the court broad powers in making this adjustment: "In all cases the court has power to make compensatory adjustment between the respective parties according to the ordinary principles of equity."

5

¶13    Although owelty often arises in the form of a monetary award, historically these "ordinary principles of equity" have included the power to impose servitudes.  For example, one partition case from Massachusetts involved a court granting an air and light easement to one tenant-in-common, thus imposing a servitude on another.  *Bornstein v. Doherty* (Mass. 1910), 90 N.E. 531, 532, *cited in Matter of Marta* (Del. 1996), 672 A.2d 984, 987.  In justifying this grant, the Massachusetts Supreme Judicial Court stated, "There is no doubt of the jurisdiction of the court, in [partition] proceedings, to annex reasonable easements to one part of the land, and impose reasonable servitude upon another part . . . ."  A few years previous, the Virginia Supreme Court of Appeals squarely held: "'Where lands are incapable of exact or fair division, the court has power to compensate by a charge upon the land by way of rent, servitude, or easement.'"  *Martin v. Martin* (Va. 1897), 27 S.E. 810, 811 (quoting *Pomeroy's Equity Jurisprudence* § 1389).  Given this expansive understanding of a court's equitable powers, and given that § 70-29-209(2), MCA, grants such powers to the district court, we conclude that it is within the court's powers to impose a servitude such as a "no build" zone.

¶14    Kellogg argues that, since neither party sought to impose a "no build" zone, the court exceeded its powers in imposing one. In seeking to have the property partitioned, Kellogg did not seek to have the property divided along a particular line. That was left to the discretion of the court. Likewise, even though neither party sought to impose "no build" zones, the court, in exercising its equitable powers, had the discretion to adopt the Referees' recommendation in that regard.

6

¶15 The dissent states that the issue of the "no-build zone" arose at "the end of the litigation *by way of judgment*," thereby inferring that Kellogg was caught off guard and should not be faulted for failing to raise constitutional objections. Such was not the case. When the referees' report recommending a "no-build zone" was filed, the District Court ordered the parties to file objections thereto before the Court decided whether to adopt the recommendations. Although Kellogg had advance notice that the District Court was entertaining adoption of the no-build zone and filed an objection contending that the recommendation exceeded statutory authority, he did not argue that the no-build zone constituted an unconstitutional taking of his property. Thus, in arguing that the judgment herein interferes with the fundamental constitutional right of "[p]ossessing and protecting property" under Article II, Section 3, of the Montana Constitution and amounts to an unconstitutional "taking" of Kellogg's property, the dissent addresses theories which were neither raised in nor addressed by the District Court. A party may not raise new arguments or change his legal theory on appeal because it is unfair to fault the trial court on an issue that it was never given an opportunity to consider. *State v. Gouras*, 2004 MT 329, ¶ 26, 324 Mont. 130, ¶ 26, 102 P.3d 27; *State v. Carter*, 2005 MT 87, ¶ 13, 326 Mont. 427, ¶ 13, ___ P.3d ___, ¶ 13.

### ISSUE TWO

*Whether the District Court's findings of fact are sufficient to support the imposition of building restrictions.*

7

¶16     Even assuming that the court has the equitable power to impose building restrictions, Kellogg contends that the court's findings of fact are insufficient to support such restrictions. The "no build" zones of this case are different from the servitudes in the above-cited partition cases because they have been imposed on *both* parties. This is permissible so long as the court imposes the servitudes in order to equitably divide the property. *See* above discussion of § 70-29-209, MCA. However, Kellogg argues that the Referees recommended the "no build" zones, not in order to equitably divide the property, but for the purpose of alleviating acrimony between neighbors. He contends that such a purpose is outside of the court's equitable powers in a partition action and is thus illegitimate.

¶17     Although Kellogg is correct in arguing that the Referees relied, in part, on the rationale of alleviating neighborly tension, that was not the Referees' only stated reason for recommending the "no build" zones. As mentioned earlier, another reason was to "reduce the need for any new permanent service roads." Given the "swiss cheese" nature of the tenancy and neighboring properties, there is already a large problem in the Joslin Basin with accommodating every structure with vehicular access. The Referees were obviously addressing the concern that either Kellogg or Dearborn would sell some of the land on the meadow separating their homes and that the new owners would then build structures on that land and seek access through Dearborn's and/or Kellogg's property. In order to head-off such a demand for future easements, the Referees thought it wise to ban future building on

8

these areas of land.[1] With the ban in place, the division of the properties is more equitable because there will be less demand for new disruptive service roads. The Referees' recommendation, adopted by the District Court, adheres to the "ordinary principles of equity" referenced in § 70-29-209, MCA.

¶18    We conclude that the court's imposition of the "no build" zone is supported by the Referees' recommendations as adopted by the District Court and the resulting concern with reducing the need for new permanent service roads as well as the concern with reducing potential friction between the litigants.

## CONCLUSION

¶19    We affirm the judgment of the District Court.

/S/ W. WILLIAM LEAPHART

We Concur:

/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS
/S/ JOHN WARNER

---

[1]The Referees also recommended imposing a "no build" zone on a separate section of Dearborn's land, wholly removed from Kellogg's. Since Dearborn does not object to this zone, it is not addressed in this opinion.

9

Justice Jim Rice dissenting.

¶20     "That alone is a just government," wrote James Madison,
        "which impartially secures to every man, whatever is his own."

*Kelo v. City of New London* (2005), 162 L.Ed.2d 439, ___, 125 S.Ct. 2655, 2677 (Justice

Sandra O'Connor, dissenting).

¶21     Believing that the judgment interferes with the fundamental constitutional right of

"possessing and protecting property," *see* Article II, Section 3, Montana Constitution, I

would reverse the District Court's imposition of the "no-build zone" on the property involved

in this matter.

¶22     "[I]n order to be fundamental, a right must be found within Montana's Declaration

of Rights or be a right 'without which other constitutionally guaranteed rights would have

little meaning.'" *MEIC v. Dept. of Environmental Quality*, 1999 MT 248, ¶ 56, 296 Mont.

207, ¶ 56, 988 P.2d 1236, ¶ 56 (citing *In the Matter of C.H.* (1984), 210 Mont. 184, 201, 683

P.2d 931, 940).    Found within the Declaration of Rights, the right of property is a

fundamental one, dictating that the standard of review applied to governmental action

affecting this interest is "the most stringent standard, strict scrutiny." *MEIC*, ¶ 60 (citing

*Wadsworth v. State* (1996), 275 Mont. 287, 302, 911 P.2d 1165, 1174).

¶23     Kellogg argues that the court's imposition of the no-build zone upon the subject

property equates to a "taking" of his private property interests without due process.  He

asserts that, by seeking partition of the property, he did not surrender use rights to the

property or waive due process.  Kellogg's takings construct is appropriate; many of the cases

10

which have analyzed the kinds of property interests which can be impinged by government action fall within our takings jurisprudence.

¶24 In *Knight v. City of Billings* (1982), 197 Mont. 165, 642 P.2d 141, deed restrictions were imposed on residential properties pursuant to the city's approval of nearby commercial development. Although noting the unique circumstances of the case, we nonetheless recognized the constitutional issue raised by the imposition of a servitude upon property, and our holding reversed the District Court's approval of such imposition:

> Though no physical taking has occurred, the result of the City's actions has been to impose a servitude, a limitation upon the use and marketability of plaintiffs' properties as residential. . . .
>
> . . . .
>
> . . . [T]he City of Billings, although exercising its police power validly, and validly refusing to amend its zoning ordinance on plaintiffs' petition, nonetheless thereby interfered with the private property interests of the plaintiff so as to constitute a "taking" by inverse condemnation.

*Knight*, 197 Mont. at 173-74, 642 P.2d at 145-46. In *Galt v. State Dept. of Fish, Wildlife* (1987), 225 Mont. 142, 731 P.2d 912, which analyzed property rights vis-a-vis the public trust doctrine, we invalidated statutes which authorized use of private property adjacent to state waters for recreational purposes, such as for portage, declaring that "[w]e reaffirm well established constitutional principles protecting property interests from confiscation." *Galt*, 225 Mont. at 148, 731 P.2d at 916. We thus concluded that, despite the lack of a physical taking, regulation of the use of private property was nonetheless "confiscation." Likewise, in *Knight v. City of Missoula* (1992), 252 Mont. 232, 827 P.2d 1270, we concluded that a taking could occur by way of "increased traffic and the resultant increase in noise, dust, and

11

fumes, etc., when no physical taking has occurred." *Knight*, 252 Mont. at 241, 827 P.2d at 1275. These cases establish that the imposition of a restriction or servitude upon property, such as imposed here, is as much a taking of a property right as the physical capture of property in a direct condemnation action, and the same constitutional principles must apply.

¶25 The question then becomes whether a servitude may be imposed upon property by a court within a partition action when the statute authorizing the proceeding does not provide for such impositions. Respondents frame the issue to the contrary, urging that "[t]he issue is not whether the District Court violated Montana's statutes by imposing a remedy that was not expressly provided for in the statutes" but, rather, "whether the Court's equitable discretion permitted it to adopt a Referee's Report that included 'no-build' zones as an integral part of a complex land division." The Court sides with Respondents, concluding that there are "broad powers" within § 70-29-209(2), MCA, which allow the imposition of servitudes as a matter of equity. I disagree.

¶26 The fundamental right of property and the concomitant constitutional standards of review do not simply vanish under the exercise of equity. Neither can a court grant relief by equity which exceeds statutory authorization. "In Montana, an action for partition is a special statutory proceeding. 'We must therefore look to the statute for the authority to bring the action, and for the procedure to be followed both in bringing the action and after it is instituted.'" *Lawrence v. Harvey* (1980), 186 Mont. 314, 319, 607 P.2d 551, 555 (citing *Hurley v. O'Neill* (1905), 31 Mont. 595, 79 P. 242, 243). Similarly, in *Fernandes v. Rodriguez* (Conn. 2000), 761 A.2d 1283, the Supreme Court of Connecticut discussed the

12

history of partition and, under statutes giving the trial court broad equitable powers, noted that remedies were nonetheless limited by statute:

> Due to the frequent impracticality inherent in actual division, however, all states, except Maine, have, by statute, expanded the right to partition to permit a partition by sale under certain circumstances.  See Restatement, 2 Property c. 11, pp. 658-61. . . .
>
> On the basis of the history of the right to partition, and in light of the legislative treatment of that right, we have held repeatedly that in resolving partition actions, the *only* two modes of relief within the power of the court are partition by division of real estate and partition by sale. "[A] court is limited to rendering a judgment of either partition in kind or by sale of the real property; *Klaus* v. *Klaus*, 143 Conn. 218, 221, 121 A.2d 283 (1956); thus terminating the ownership relationship between the parties."   [Citations omitted.] Accordingly, remedies that fall outside the realm of partition in kind or partition by sale are not "legally permissible"; *Wilcox* v. *Willard Shopping Center Associates*, supra, 324, 544 A.2d 1207; and a "court is precluded from substituting its own ideas of what might be a wise provision in place of a clear expression of legislative will." *Penfield* v. *Jarvis*, supra, at 474-75, 399 A.2d 1280.

*Fernandes*, 761 A.2d at 1288-89 (italics in original; underlining added).

¶27    Our statute requires as follows:

> [I]f it appear by the evidence . . . to the satisfaction of the court that the property or any part is so situated that the partition cannot be made without great prejudice to the owners, the court may order a sale thereof; otherwise, upon the requisite proofs being made, *it must order a partition according to the respective rights of the parties* as ascertained by the court . . . .

Section 70-29-202, MCA (emphasis added).[2]

---

[2]Section 70-29-205, MCA, imposes the same requirement upon the referees: "In making partition, the referees must divide the property and allot the several portions thereof to the respective parties, quality and quantity relatively considered, *according to the respective rights of the parties* as determined by the court, pursuant to the provisions of this chapter . . . ." (Emphasis added.)

13

¶28    This Court has not hesitated to overturn partition orders which exceed statutory parameters. In *Lawrence*, we stated that the partition court may "make an equitable adjustment of the cotenants' interests," but reversed the judgment at issue, noting that the equities within a partition suit "are *limited to such as arise from the partition of the land.*" *Lawrence*, 186 Mont. at 323, 607 P.2d at 557 (citing 4 Thompson on Real Property §§ 1829, 1830 at 331 (1979)) (emphasis added). We also emphasized from the statute that the purpose of a partition action was "'to divide among the co-owners land held by them either as joint tenants or as tenants in common *according to their respective interest.*'" *Lawrence*, 186 Mont. at 319, 607 P.2d at 555 (quoting *Emery v. Emery* (1948), 122 Mont. 201, 200 P.2d 251, 265) (emphasis added).

¶29    The Court today attempts to stretch this statutory authority by relying on the reference in § 70-29-209(2), MCA, to "principles of equity," which it describes as "broad powers." *See* ¶ 12. However, this section addresses the court's authority to "adjudge compensation to be made by one party to another" when "a partition cannot be made equal between the parties according to their respective rights." Here, no compensatory award pursuant to this section was made and, in any event, the reference to "principles of equity" in a provision addressing such awards does not authorize the court to impose new servitudes on the property. The Court also relies on two turn-of-the-last-century cases from other states which approve imposition of "reasonable easements," "reasonable servitudes," "rents," and "charges" in partition actions, but which bear no relation to either our statutes or to our constitutional jurisprudence.

14

¶30     That the District Court exceeded its authority under our statutes can be readily seen: under the partition order, the parties have "lesser" property interests separately than they had together. That is, the property now bears a servitude, or restriction on use, that did not previously exist. The District Court has thus rendered the sum of the parts as less than the whole. To the contrary, property owners cannot *lose* property in a partition action: "the court . . . must order a partition *according to* the respective rights of the parties . . . ." Section 70-29-202, MCA (emphasis added). If the property is to be divided "according to" the owners' property rights, such division cannot *reduce* those property rights. "A court's function when deciding a partition action is not to create new interests in property held by tenants in common, but is merely to sever the unity of possession owned by the tenants." *Martinez v. Martinez* (Colo. App. 1981), 638 P.2d 834, 836 (citing *Johnson v. Ford* (Ark. 1961), 345 S.W.2d 604).

¶31     Allowing a partition court to impose servitudes not authorized by statute[3] turns the judge into a glorified land planning officer for purposes of the subject property. However, a partition action is not a subdivision and platting task in which the court can impose restrictions upon property over the owner's objection, regardless of how convenient or beneficial such authority would be. The flexibility which the trial court enjoys when acting in equity is necessarily circumscribed by the statutes governing that process. To allow courts

---

[3]The statutes specifically provide that a portion of partitioned property may be set aside for a road under the conditions set forth therein. *See* § 70-29-205(2), MCA.

15

to go beyond the statute invites what occurred here: a loss of property interests, for purposes of a convenient division, which violated a fundamental constitutional right.

¶32   The Court responds that this dissent "addresses theories which were neither raised in nor addressed by the District Court." Under the circumstances, this is entirely reasonable.

¶33   The central premise for the constitutional violation is that the District Court restricted property rights by exceeding its statutory authority–a premise which the Court does not rebut. When the referees' report was filed in the District Court, Kellogg filed objections thereto, arguing that the no-build zone "was beyond the scope of a partition action or the authority of the referees or the Court." Kellogg argued that the referees' recommendation violated the statute and requested the District Court to remand the matter to the referees for a redetermination without the offending building restrictions.

¶34   The District Court rejected that request and, without further proceedings, decreed that the no-build zone be imposed. It was this error by the District Court which violated the Constitution. Unlike other litigation, where parties seek remedies for past grievances, there was no constitutional violation here until the District Court rejected Kellogg's correct argument that the referees had exceeded their statutory authority, and ordered the imposition of a no-build zone on the property. Thus, the constitutional violation occurred at the end of the litigation *by way of the judgment*–with the District Court as the state actor. As such, it was entirely appropriate for Kellogg to argue on appeal that the judgment itself violated due process, and for this Court to respond.

¶35   I would reverse.

16

/S/ JIM RICE


Chief Justice Karla M. Gray joins in the dissent of Justice Rice.


/S/ KARLA M. GRAY