DA 12-0464

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 176

JOHN JUNIOR HUGHES, SHIRLEY A.
HUGHES, JASON A. HUGHES and
J&S FAMILY LIMITED PARTNERSHIP,

       Plaintiffs and Appellants,

  v.

JOHN R. HUGHES, III,

       Defendant and Appellee.

APPEAL FROM:    District Court of the Tenth Judicial District,
                     In and For the County of Fergus, Cause No. DV 11-28
                     Honorable Laurie McKinnon, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              W. Scott Green, Patricia D. Peterman, Patten, Peterman, Bekkedahl & Green,
              PLLC; Billings, Montana

       For Appellee:

              Jonathan W. Stidham, Stidham & Stidham, P.A.; Bartow, Florida

Submitted on Briefs:  April 10, 2013

Decided:   July 2, 2013

Filed:

_____
                          Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 The District Court for the Tenth Judicial District, Fergus County, consolidated multiple complaints. The dispute arose between Johnny Hughes (Johnny) and his parents, Jack and Shirley Hughes (Jack and Shirley), regarding borrowed money, the partition of jointly owned real property and accompanying water rights, and a contested pasture lease. The District Court ruled in favor of Johnny on all of the disputes except for the water rights. Jack and Shirley appeal and Johnny cross-appeals.

¶2 We affirm in part, reverse in part, and remand.

¶3 We address the following issues on appeal:

¶4 *Whether Johnny's undesignated payments to Jack and Shirley restarted the statute of limitations on the 1989 promissory note?*

¶5 *Whether Jack and Shirley possess a life estate in the new house or a right to any of the insurance proceeds?*

¶6 *Whether Jack is entitled to an easement for stock water across Johnny's property?*

¶7 *Whether the arbitrator exceeded his authority or miscalculated damages?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶8 Jack and Shirley loaned $104,375 to Johnny on January 1, 1989. Johnny executed a promissory note in favor of Jack and Shirley to evidence this loan. Johnny divorced his wife in 1997. Johnny asked Jack and Shirley for a loan of $180,000 to settle with his wife. Johnny had not yet made any payments on the 1989 promissory note. Jack and Shirley

2

loaned Johnny an additional $180,000 to settle with his wife on September 24, 1997. Johnny gave Jack and Shirley a second promissory note to evidence this 1997 loan.

¶9 Johnny made a series of payments to Jack and Shirley between 1999 and 2008 that totaled $155,000. Jack and Shirley filed an action to collect the unpaid debt on the two promissory notes after they had a falling out with Johnny. The District Court determined that the statute of limitations barred Jack and Shirley from collecting on the 1989 promissory note.

¶10 Johnny claimed, as a result, that 100% of his payments should be applied to the 1997 promissory note. Jack and Shirley argued that the payments should be divided between the two loans. A decision to divide the payments between the two loans would lead to a higher remaining balance on the 1997 promissory note. The court submitted the question of the proper division of the payments between the two promissory notes to the jury. The jury divided these payments on a pro-rata basis between the two promissory notes.

¶11 The District Court awarded attorney fees to Johnny as the prevailing party pursuant to a provision of the promissory notes. Jack and Shirley appeal the District Court's conclusion that the statute of limitations barred collection on the 1989 note. Jack and Shirley further appeal the District Court's determination that Johnny represented the prevailing party and the accompanying award of attorney fees to Johnny.

¶12 Jack and Shirley granted Johnny an undivided 56% interest in the Melby Ranch through three separate deeds in 1984, 1985, and 1986. Jack and Shirley reserved for themselves a life estate in the buildings and improvements on the property. Johnny has lived

3

in a house on the Melby Ranch since 1977. A fire destroyed the house on the Melby Ranch in 2006. Johnny received an insurance payment of $123,156.56 for the house and $83,826.88 for his personal property. Johnny used insurance proceeds and several hundred thousand dollars of additional personal money to rebuild the house.

¶13 Jack and Shirley claimed a life estate in the new house, or an interest in the insurance payment. The District Court determined that the fire had extinguished any life estate in the house claimed by Jack and Shirley. The court furthered rejected their claim to a share of the insurance proceeds. Jack and Shirley appeal.

¶14 Jack, Shirley, and Johnny engaged three referees in 2011 to partition Melby Ranch. The parties at that point owned Melby Ranch as tenants in common based on the 56% interest granted to Johnny through the three separate deeds in 1984, 1985, and 1986. The referees considered an equitable division of the property after the District Court had issued its order regarding the fact that Jack and Shirley's life estate in the house on the Melby Ranch property had ended.

¶15 The parties agreed to the referees' proposed division of land. Johnny received the land where the new house sits as part of the partition. Johnny claims that Jack and Shirley's decision to accept the partition agreement extinguished whatever life estate that they may have retained in the new house.

¶16 The referees suggested, and the parties agreed, that Johnny would receive a section of land that included Flatwillow Creek. Jack possessed a water right to use the water from Flatwillow Creek for stockwater purposes. Jack owns a neighboring section of land that had

4

not been subject to the partition. Jack claims that historically he had allowed his cattle free access to Flatwillow Creek across the section of land that Johnny now owns. The parties intend to fence the boundaries of their respective properties to reflect the partition agreement. Jack sought an easement from the District Court for a water gap in the fence to access the creek, or for a pipe to bring water from Flatwillow Creek to Jack's land.

¶17 The District Court first determined that it lacked jurisdiction over water issues. The District Court also granted, in the same order, a water gap to Jack. The parties asked the District Court to clarify its order. The District Court determined that it no longer possessed jurisdiction over the case due to the fact that Jack and Shirley already had filed a notice of appeal. The District Court declined to alter its decision. The District Court clarified that it did not believe that it possessed jurisdiction over the water issue, and, therefore, it should not have granted a water gap to Jack. Johnny appeals the District Court's order that granted the water gap.

¶18 Johnny and his brother, Jay Hughes (Jay), created P Standing X Cattle Company. Johnny and Jay, together and as partners in P Standing X Cattle Company, entered into a Pasture Lease with Jack and PX Cattle Company in 2000. Johnny and Jay dissolved the P Standing X Partnership in 2008. Jay assigned his interest under the Pasture Lease to Johnny. Jack attempted to terminate immediately the Pasture Lease with notice to Johnny. Jack prevented Johnny from accessing the pasture land after the termination notice. Jack and Jay seized hay that belonged to Johnny from the pasture land.

5

¶19 The parties submitted their dispute regarding the termination of the Pasture Lease to arbitration. The arbitrator determined the Pasture Lease still to be valid when Jack and Jay prevented Johnny from accessing the pasture land and when they seized Johnny's hay. The arbitrator awarded $195,110 in damages to Johnny and further determined that Jack and Jay must return Johnny's hay crop. Jack and Shirley appeal.

## STANDARD OF REVIEW

¶20 We review de novo a district court's conclusions of law. *Newman v. Scottsdale Ins. Co.*, 2013 MT 125, ¶ 22, 370 Mont. 133, 301 P.3d 348. We review for abuse of discretion a district court's refusal to modify or vacate an arbitration award. *Paulson v. Flathead Conservation Dist.*, 2004 MT 136, ¶ 18, 321 Mont. 364, 91 P.3d 569.

## DISCUSSION

¶21 *Whether Johnny's undesignated payments to Jack and Shirley restarted the statute of limitations on the 1989 promissory note?*

¶22 Johnny contends that Jack and Shirley had six years, under § 30-3-122(2), MCA, after they made a demand for payment in 1999 to commence an action to enforce the 1989 promissory note. Section 30-3-122(2), MCA, provides for a six-year statute of limitations in situations where a party demands payment from the maker of the promissory note. The six-year limitations period normally would have run in 2005.

¶23 Jack and Shirley argue, however, that Johnny had made partial payment of interest on the 1989 promissory note. Section 27-2-409, MCA, provides that "[a]n acknowledgment or the part payment of a debt is sufficient evidence to cause the relevant statute of limitations to

6

begin running anew." "Part payment" includes "any payment of principal or interest." Section 27-2-409, MCA. An acknowledgment must be contained in a writing signed by the debtor. Section 27-2-409, MCA.

¶24 Johnny argues that the more specific statute, § 30-3-122, MCA, directly addresses a statute of limitations for a promissory note. Johnny argues that the six-year statute of limitations codified in § 30-3-122, MCA, would be rendered "irrelevant surplusage" if it were subjected to the qualifier in § 27-2-409, MCA. Further, Johnny argues that § 27-2-409, MCA, does not apply to commercial transactions governed by the Uniform Commercial Code.

¶25 Section 27-2-409, MCA, does not displace the statute of limitations described in § 30-3-122, MCA. Section 27-2-409, MCA, instead provides that "the relevant statute of limitations" will "begin running anew" if a party acknowledges or partially pays a debt. Section 30-3-122, MCA, provides the "relevant statute of limitations" for a promissory note. This statute of limitations would "begin running anew" if Johnny had partially paid on the note. Section 27-2-409, MCA.

¶26 Nothing in the language of § 27-2-409, MCA, precludes its application to contracts made pursuant to the Uniform Commercial Code, to specific types of debts, or to a promissory note. The clear language of § 27-2-409, MCA, demonstrates that the statute applies to a "debt." A promissory note evidences a "debt." *See Carelli v. Hall*, 279 Mont. 202, 206, 926 P.2d 756, 759 (1996). We turn to whether Johnny made partial interest payments on the 1989 promissory note.

7

¶27 Johnny made multiple payments to Jack and Shirley between 1999 and 2008. Johnny provided Jack and Shirley with no instructions as to which note to apply the payments. A creditor retains the discretion to apply a payment to multiple promissory notes and thereby keep the statute of limitations running on each note. *Mercer v. Mercer*, 120 Mont. 132, 136, 180 P.2d 248, 250 (1947). The appropriate allocation of payments between two different promissory notes represents a question of fact for the jury. *Mercer*, 120 Mont. at 136, 180 P.2d at 250. The jury's finding that Johnny had made payments on the 1989 promissory note would restart the statute of limitations pursuant to § 27-2-409, MCA.

¶28 The jury considered whether Johnny's multiple payments should have been applied entirely toward the 1997 promissory note, or if part of the payments also should have been applied toward the 1989 promissory note. The jury heard evidence that Johnny had made ten payments that totaled $155,000. The jury further heard evidence that Johnny had deducted as interest this full amount on his income tax return. Jack and Shirley claimed that the $155,000 in payments exceeded the amount of interest that Johnny owed on the 1997 promissory note. Jack and Shirley argued that Johnny's decision to claim the full $155,000 as interest on his tax returns further demonstrated his intent to pay both the 1997 promissory note and the 1989 promissory note.

¶29 Jack and Shirley claimed that they applied the payments to the two notes on a pro-rata basis. Johnny owed the original $180,000, plus $202,320 in interest, on the 1997 promissory note by the time of trial. Jack and Shirley deducted from this total Johnny's pro rata interest

8

payment of $98,115 for an outstanding balance of $284,205. The jury agreed with Jack and Shirley that Johnny owed $284,205 on the 1997 promissory note.

¶30  The jury's finding that Johnny had paid $98,115 in interest on the 1997 promissory note implies a finding by the jury that Johnny must have paid the remaining $56,885 of his $155,000 in interest payments toward the 1989 promissory note. This Court has adopted the doctrine of implied findings for the purpose of reviewing findings of fact. *State v. Wooster*, 2001 MT 4, ¶ 18, 304 Mont. 56, 16 P.3d 409. Where "findings are general in terms, any findings not specifically made, but necessary to the determination are deemed to have been implied, if supported by the evidence." *Wooster*, ¶ 18. Here the evidence clearly supports an implied finding that Johnny paid the remaining interest toward the only other outstanding loan: the 1989 promissory note. The jury's determination that Johnny had paid interest on the 1989 promissory note thereby restarted the statute of limitations. Section 27-2-409, MCA.

¶31  No need exists to remand this issue to a new jury due to the fact that Johnny already argued to the jury that the entire $155,000 in payments should have been applied to the 1997 promissory note, rather than split between the 1997 note and the 1989 note. The jury rejected Johnny's claim. Further, a creditor can apply a payment to multiple promissory notes and keep the statute of limitations running on each note. *Mercer*, 120 Mont. at 136, 180 P.2d at 250. We remand to the District Court solely to consider the amount of principal and interest that Johnny now owes on the 1989 promissory note.

9

¶32     Our decision that Johnny restarted the statute of limitations on the 1989 promissory note leaves Jack and Shirley as the prevailing party on this issue. As a result, we also vacate the District Court's award of attorney fees to Johnny. We remand to the District Court to determine appropriate attorney fees for Jack and Shirley on this issue.

¶33     *Whether Jack and Shirley possess a life estate in the new house or a right to any of the insurance proceeds?*

¶34     The partition divided the Melby Ranch property jointly owned by Johnny, Jack, and Shirley. The land that Johnny received included the property where the new house sits. Johnny argues that he would not have accepted the partition if he had known that Jack and Shirley would continue to claim a life estate in the house. Johnny further argues that he independently chose to maintain insurance on the old house.

¶35     We have considered the legal result of an order partitioning property. *Britton v. Brown*, 2013 MT 30, 368 Mont. 379, 300 P.3d 667. An order that partitions property extinguishes a tenant's rights in the whole property and establishes the tenant's exclusive right of ownership in the part of the property that the partition grants to the tenant. *Britton*, ¶ 24. The principles of equity and due process guide the partition of real property. *Britton*, ¶ 27. Parties to a partition action maintain the right to object to the referees' partition report before the district court. *Britton*, ¶ 29. The party who believes that the referees' report is deficient bears the burden of offering sufficient evidence to support her objection. *Britton*, ¶ 29.

10

¶36 The referees divided the Melby Ranch property equitably based on the relative value of the property as it existed at the time of the partition in 2011. The fire destroyed the old house in 2006. Johnny used the insurance proceeds, along with his own money, to rebuild the house. The new house sat on a parcel of land that Johnny received in the partition. The referees noted that the District Court already had decided that Jack and Shirley no longer possessed a life estate in the new house. The partition recommendation recognizes that "[o]n 24 May 11 the court rendered a decision ordering that plaintiff no longer has any life estate interest in the residence occupied by the defendant." The referees' partition of the property took into account the District Court's decision.

¶37 Jack and Shirley did not exercise their right to object to the partition recommendation. *See Britton*, ¶ 29. Instead, Jack and Shirley agreed to the partition. The partition order, which granted Johnny the portion of the Melby Ranch property where the new house sits, extinguished any claim to a life estate that Jack and Shirley may have retained in the new house. *See Britton*, ¶ 24. Further, it would be inequitable to grant Johnny the land where the new house sits, but prevent Johnny from fully utilizing this land by recognizing Jack and Shirley's claim to a life estate in the new house. We decline to alter the partition agreement to grant Jack and Shirley a life estate that the parties did not contemplate as part of the partition agreement.

¶38 The partition agreement similarly dissolved whatever right to insurance proceeds that Jack and Shirley may have possessed. The District Court had determined that Jack and Shirley possessed no right to the insurance proceeds before the referees made their partition

recommendation. Johnny had used the insurance proceeds to build the new house. Johnny accepted the partition with the understanding that he possessed not only the house, but also the full value of the insurance proceeds that he had used to rebuild the house. Jack and Shirley failed to reserve their right to appeal the insurance allocation decision when they accepted the terms of the partition. *See Britton*, ¶ 24. We decline to alter the partition agreement now.

¶39 *Whether Jack is entitled to an easement for stock water across Johnny's property?*

¶40 This Court has recognized that district courts have the authority to supervise the distribution of water that already has been adjudicated. *Kruer v. Three Creeks Ranch of Wyoming, L.L.C.*, 2008 MT 315, ¶ 22, 346 Mont. 66, 194 P.3d 634. Similarly, an easement to access a water right represents a separate and distinct property right from a water right. This Court's determination as to whether an easement exists to access a water right is "entirely bifurcated from the water right issue." *Mildenberger v. Galbraith*, 249 Mont. 161, 166, 815 P.2d 130, 134 (1991).

¶41 Jack already has adjudicated his water rights. Jack, through J&S Family Limited Partnership, possesses a water right to use Flatwillow Creek for stock water. The District Court possessed jurisdiction to determine whether Jack held an easement to access Flatwillow Creek. *See Kruer*, ¶ 22; *Mildenberger*, 249 Mont. at 166, 815 P.2d at 134.

¶42 Jack argues that he possesses an implied easement over Johnny's property to access Flatwillow Creek to exercise his water right. Jack argues that this implied easement arose from the partition. We require that a partition should be fashioned to cause the least degree

12

of harm to the co-tenants. *Kravik v. Lewis*, 213 Mont. 448, 454, 691 P.2d 1373, 1376 (1984). Partitions should confer no unfair advantage to any one co-tenant. *Kravik*, 213 Mont. at 454, 691 P.2d at 1376. We also have recognized that a district court possesses the power to grant easements to ensure an equitable distribution of property in a partition. *Kellogg v. Dearborn Info. Servs., L.L.C.*, 2005 MT 188, ¶ 13, 328 Mont. 83, 119 P.3d 20.

¶43 For an easement by existing use to arise, Jack must prove that unity of ownership existed between the two parcels, severance, and an apparent, continuous, and reasonably necessary use of the quasi-servient tenant for the beneficial use and enjoyment of the quasi-dominant tenement. *Yellowstone River, LLC v. Meriweather Land Fund I, LLC*, 2011 MT 263, ¶ 30, 362 Mont. 273, 264 P.3d 1065. Neither party disputes these factors. Jack previously owned both parcels. The partition severed the joint ownership. Access across Johnny's parcel proves reasonably necessary for Jack to continue to exercise his stock water right to Flatwillow Creek.

¶44 Jack also must show that the parties intended the use to continue after the severance of the two parcels. *Meriweather Land Fund I*, ¶ 30. Jack initially conveyed partial ownership of the parcel with Flatwillow Creek to Johnny. Jack continued to use Flatwillow Creek as a source of stock water after this partial transfer of ownership to Johnny. No other source of stock water exists for Jack to use for the cattle. Jack later agreed to the partition that granted Johnny full ownership of the parcel with Flatwillow Creek. Nothing in the record suggests that Jack intended to stop using the stock water. Johnny knew of Jack's use of Flatwillow

13

Creek for stock water. Johnny also knew that no other source of water existed for Jack to use for his cattle.

¶45 The partition agreement would prove inequitable if it results in Jack's loss of the use of his stock water right to Flatwillow Creek. *See Kravik*, 213 Mont. at 454, 691 P.2d at 1376. The partition agreement makes no mention of Jack's stock water right to Flatwillow Creek. We will not presume that Jack intended to give up the use of his stock water right when he agreed to the partition. The record supports Jack's claim that he intended to continue using Flatwillow Creek after the partition of the Melby Ranch property. The record further supports Jack's entitlement to an implied easement by existing use.

¶46 Johnny argues that Jack should not receive an easement because Jack gave up all of his water rights to Flatwillow Creek when Jack agreed to the partition agreement. Johnny points out that the referees valued the various parcels of land based on whether the land was "dry pastureland" or "irrigated land." Johnny received all of the irrigated land that was available as part of the partition. Johnny argues that Jack recognized, when he agreed to the partition, that Jack was giving up all of his water rights to Flatwillow Creek. Johnny's argument overlooks the fact that Jack claims a water right for, and seeks an easement to benefit, land that was not subject to the partition. Jack's decision to accept the partition does not reflect Jack's intention to give away his water rights for land not included in the partition agreement. We remand to the District Court to consider best how to provide Jack with access to Flatwillow Creek to exercise his water right for stock water.

¶47 *Whether the arbitrator exceeded his authority or miscalculated damages?*

14

¶48 Jack, Shirley, and Johnny agreed to arbitrate their Pasture Lease dispute. The parties stipulated that the arbitrator would address the following issues: whether the Pasture Lease had been terminated; whether any damages should be awarded, and, if so, in what amount; who is entitled to the 2010 hay crop related to the lease property; and whether any party is entitled to damages as a result of the hay distribution for the 2010 crop year.

¶49 Jack sent Johnny a notice of termination of the lease on February 18, 2010. The arbitrator considered whether this notice successfully had terminated the Pasture Lease. The arbitrator concluded that this notice had not terminated the lease, or, in the alternative, had not terminated the lease immediately. The arbitrator awarded damages to Johnny.

¶50 We focus our analysis on whether the notice provided by Jack terminated the Pasture Lease immediately. The Pasture Lease permitted immediate termination only if Johnny and Jay "cease to operate a continuous ranching business." Johnny and Jay had dissolved their partnership. The arbitrator determined nevertheless that Johnny and Jay individually still continued to operate a ranching business in compliance with the provision of the Pasture Lease. Immediate termination did not represent an option under these circumstances.

¶51 The parties agreed that the term of the lease had been 3 years. The arbitrator determined that the lease term began on January 1, 2000. Subsequent renewals led to a situation where the lease term would not have expired until January 1, 2012. Johnny and Jay had abided by the lease's requirement that they continue to operate a ranching business. Jack thus possessed the authority only to terminate the lease at its expiration on January 1, 2012

15

when he sent the notice to Johnny in 2010. Jack instead treated his notice as an immediate termination of the Pasture Lease.

¶52 Jack prevented Johnny from using the pasture in 2010 and 2011. Jack and Jay also took possession of a hay crop from the pasture that belonged to Johnny. The Pasture Lease would have remained valid through its expiration of January 1, 2012 even if we assume that Jack successfully had provided notice to Johnny of his intent to terminate. Jack unlawfully excluded Johnny from the property in 2010 and 2011. Jack's unlawful exclusion of Johnny during the remaining term of the Pasture Lease entitles Johnny to damages for 2010 and 2011.

¶53 Jack and Shirley next contend that the arbitrator's award should be vacated for failure to follow clearly established Montana law regarding the appropriate measure of damages for the loss of future offspring from a cow. This Court has recognized that an arbitration award can be vacated if the arbitrator ruled in manifest disregard of the law. *Geissler v. Sanem*, 285 Mont. 411, 417-18, 949 P.2d 234, 238-39 (1997). Manifest disregard of the law requires more than simple misapplication of the law. The arbitrator must appreciate the existence of a clearly established governing legal principle, but simply decide to ignore or pay no attention to it. *Geissler*, 285 Mont. at 417-18, 949 P.2d at 238-39.

¶54 Johnny argued that the breach of the Pasture Lease forced Johnny to sell over 100 cows two years before he normally would have sold them. Damages for breach of contract seek to put the plaintiff in the position that he would have been in but for the breach. *McEwen v. MCR, LLC*, 2012 MT 319, ¶ 65, 368 Mont. 38, 291 P.3d 1253. Johnny claimed

16

that each of these 100 cows would have produced two more calves during the term of the Pasture Lease. Johnny requested $200 for each of the 200 calves that would have been born to these cows if Johnny had not been forced to sell the cows early due to Jack's immediate termination of the lease in 2010. The arbitrator awarded $40,000 in damages to Johnny to compensate him for the loss that he sustained when Jack breached the Pasture Lease.

¶55 Jack and Shirley contend that Johnny already received compensation for the value of these 200 calves when he sold the cows. Jack and Shirley argue that, pursuant to *McPherson v. Schlemmer*, 230 Mont. 81, 84, 749 P.2d 51, 52 (1988), the fair market value of an animal takes into consideration potential future offspring. Two cows were killed and needed to be replaced in *McPherson*. The court could consider the cows' ability to produce in future years when it determined the cost to replace the dead cows with similar cows. *McPherson*, 230 Mont. at 84, 749 P.2d at 53.

¶56 Jack and Shirley's argument presumes that Johnny already has been compensated fully for the loss of two calves per cow. Johnny would have been compensated if the price that Johnny had received for his 100 cows reflected a higher value than Johnny would have received if he had sold the cows in two years. If Johnny sold these cows for beef weight, their ability to produce for two more years may not have been taken into consideration. *See McPherson*, 230 Mont. at 84, 749 P.2d at 53. The record does not indicate whether Johnny received additional money to reflect the fact that he had been forced to sell his cows two years early. As a result, we cannot determine whether Johnny already had been compensated for his loss of the 200 prospective calves when he sold the cows.

17

¶57 In light of this ambiguity, we cannot say that the arbitrator disregarded clearly established Montana law. *See Geissler*, 285 Mont. at 417-18, 949 P.2d at 238-39. This Court has determined that the replacement value of a cow takes into account future offspring of the cow. *McPherson*, 230 Mont. at 84, 749 P.2d at 53. This Court has not considered, however, the appropriate measure of damages when a party is forced to sell a cow earlier than he anticipated selling it. We decline to vacate the arbitrator's award of $40,000 to Johnny.

¶58 We affirm in part, reverse in part, and remand.

/S/ BRIAN MORRIS

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JIM RICE