No. 05-271

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 273

_____

SIGRID HJARTARSON, Personal Representative
of the Estate of GARDAR HJARTARSON,
and SIGRID HJARTARSON,

        Plaintiffs, Respondents and
        Cross-Appellants,

    v.

MARLEEN HJARTARSON, MARIE HJARTARSON,
EVELYN HJARTARSON, and ICELAND FARMS, a partnership,

        Defendants and Appellants,

    and

JON HJARTARSON, DOREEN GILLESPIE,
and G&S LAND AND CATTLE COMPANY,

        Defendants and Respondents.

_____

APPEAL FROM:    District Court of the Ninth Judicial District,
                In and for the County of Toole, Cause No. DV-00-012,
                The Honorable Kenneth Neill, Presiding Judge.

COUNSEL OF RECORD:

        For Appellants Marleen Hjartarson, Marie Hjartarson and Evelyn Hjartarson:

                David F. Stufft, Attorney at Law, Kalispell, Montana

        For Appellant Iceland Farms:

                Robert G. Olson, Frisbee, Moore & Olson, Cut Bank, Montana

For Respondents and Cross-Appellants Sigrid Hjartarson and Gardar Hjartarson:

    Gary S. Deschenes, Deschenes & Sullivan, Great Falls, Montana

For Respondents Jon Hjartarson and Doreen Gillespie:

    Keith A. Maristuen, Bosch, Kuhr, Dugdale, Martin & Kaze, PLLP, Havre, Montana

For Respondent G&S Land and Cattle Company:

    Ward E. Taleff, Taleff Law Office, P.C., Great Falls, Montana

_____

Submitted on Briefs:  July 19, 2006

Decided:  October 24, 2006

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    Like too many farm families in Montana, the Hjartarsons find themselves embroiled in an intra-family squabble regarding the passing of ownership and control to the next generation.  The children of Gardar and Sigrid Hjartarson, including Marleen Hjartarson, Marie Hjartarson, and Evelyn Hjartarson, along with Iceland Farms are the Appellants in this matter.  They appeal from the Order of the Ninth Judicial District Court, Toole County, resolving the dispute between Gardar and Sigrid Hjartarson and their children over the control of the Hjartarson family farming and ranching operation. The Respondents include Jon Hjartarson, Doreen Gillespie, the G&S Land and Cattle Company and Sigrid Hjartarson for herself, and as personal representative of the estate of Gardar Hjartarson.  Sigrid Hjartarson also cross appeals.  We affirm.

¶2    We review the following issues:

¶3    Whether the District Court correctly applied the grantor-support theory rather than the principles of contractual rescission set forth at § 28-2-1713, MCA?

¶4    Whether the District Court correctly determined that the children breached the grantor-support agreement?

¶5    Whether the District Court abused its discretion in allowing Gardar and Sigrid to proceed to trial claiming breach of a grantor-support agreement?

¶6    Whether the District Court abused its discretion in finding that the $35,000 check to capitalize Iceland Farms was a loan and therefore not subject to the two-year statute of limitations for injuries involving property?

3

¶7 Whether substantial evidence supports the District Court's finding that Marleen possessed authority to withdraw $66,000 and $55,000 from Gardar's and Sigrid's personal accounts?

¶8 Whether substantial evidence supports the District Court's finding that the children were not liable for the $66,000 and $55,000 withdrawals from Gardar's and Sigrid's personal accounts?

¶9 Whether substantial evidence supports the District Court's finding that Marleen lacked authority to transfer the "named payee" of a Conservation Reservation Payment from G&S Land and Cattle to Iceland Farms?

¶10 Whether substantial evidence supports the District Court's finding that Gardar had no personal interest in the farm equipment in question?

### FACTUAL AND PROCEDURAL BACKGROUND

¶11 The families of brothers Gardar and Hjortur Hjartarson formed several business organizations to hold and operate their jointly-owned family farm. In 1979 Gardar and his wife, Sigrid, formed G&S Land and Cattle Company (G&S), and Hjortur and his wife, Judy, formed H&J Quarters, Inc. (H&J). These corporations in turn formed a partnership called "Hjartarsons" that held the real property. The couples also formed "Hjartarson Farms" as a partnership between Gardar, Hjortur, Sigrid, and Judy that served as the entity that operated the land held by "Hjartarsons." We refer to each couple's respective personal, corporate, and partnership interest in the business as the G&S group and H&J group.

4

¶12 Gardar and Sigrid began to transfer their G&S stock in 1979 to their children Marleen Hjartarson, Evelyn Hjartarson, Marie Hjartarson, Doreen Gillespie and Jon Hjartarson. Marleen, Marie, Evelyn, and Jon formed a separate partnership called "Iceland Farms," that they intended to serve as the operator for the real property held by G&S. Gardar and Sigrid eventually changed their mind and sought to rescind the stock transfers. Gardar and Sigrid also revised their wills to limit the beneficiaries to Doreen and Jon. Thus, as a practical matter, this case pits Respondents Gardar, Sigrid, Doreen, Jon, and G&S against Appellants Marleen, Evelyn, Marie, and Iceland Farms. We address the facts and issues using the names of the actual family members involved in an effort to avoid confusion.

¶13 Gardar and Sigrid maintain that in 1992 they transferred all of their remaining G&S stock to their children subject to two conditions: (1) that Gardar still would continue to be involved in the management of G&S, and (2) that the children would ensure that the corporation would continue to provide necessary living expenses to Gardar and Sigrid. Other witnesses testified that Gardar and Sigrid transferred their shares without conditions.

¶14 Following the 1992 stock transfers, Gardar remained in control as president of G&S until 1996. He remained on as a director for some time thereafter, but by 1999 he had lost all decision-making power. The corporation provided funds for Gardar's and Sigrid's living expenses through the G&S checking account up until October 2000. At that point, Marleen, Marie, and Evelyn, acting as a majority of the G&S board, voted to restrict Gardar's and Sigrid's access to G&S corporate funds.

5

¶15     Gardar petitioned a court in 1996 to partition the real and personal property of the G&S group and the H&J group, thereby terminating his business relationship with his brother, Hjortun.  The parties signed a settlement agreement in April of 1998.  Gardar and Sigrid gave Jon and Marleen powers of attorney to act on behalf of the G&S group for purposes of the settlement.

¶16     The partners divided all of the farming equipment subject to the settlement between the G&S group and the H&J group.  Gardar and Sigrid maintain that Gardar reserved a personal interest in some of the equipment transferred to G&S in the 1998 settlement.  Based on this ownership interest, Gardar and Sigrid claim that Iceland Farms owes them $22,500 in rent and $20,000 in insurance proceeds from equipment that Iceland Farms had used and damaged in the years following the 1998 settlement.

¶17     The 1998 settlement also required that the G&S group make a cash payment of approximately $120,000 to the H&J group.  Marleen made withdrawals of $66,000 and $55,000 from Gardar's and Sigrid's personal accounts to finalize the settlement.  The evidence at trial conflicted as to whether the G&S group authorized these withdrawals and whether they should be characterized as loans, or gifts to the children.

¶18     Around the time of the 1998 settlement, Marleen, Marie, Evelyn, and Jon formed Iceland Farms.  Marleen drew a $35,000 check on Gardar's and Sigrid's personal account to capitalize the partnership.  Testimony at trial, again, conflicted as to whether Marleen had the authority to write the check, and whether it was intended to be a loan, or a gift to the children.

¶19     The Farm Service Agency (FSA) office received a letter from Marleen on August 11, 1999, that instructed them to change the designated operator on a Conservation Reserve Program (CRP) contract from G&S and Gardar to Iceland Farms. This change redirected a $50,000 CRP payment from G&S and Gardar to Iceland Farms. Gardar earlier had executed a letter on July 5, 1999, to the FSA, however, revoking Marleen's power of attorney for FSA purposes. Upon discovering its mistake, the FSA wrote Iceland Farms a letter demanding repayment of the $50,000. Iceland Farms never repaid the money.

¶20     Gardar and Sigrid filed a complaint against Norwest Bank and Marleen Hjartarson on April 13, 2000. They filed an amended complaint on July 28, 2000, removing Norwest Bank and adding as defendants the remaining children, G&S, and Iceland Farms. Gardar died in September of 2002. Sigrid continued to pursue her claims, and those of Gardar, in her capacity as the personal representative for Gardar's estate.

¶21     The District Court held a bench trial on May 24 through May 27, 2004. Gardar and Sigrid sought to rescind the gifts of G&S stock that they had given to their children based on the children's breach of the alleged conditions on the stock transfer. Gardar and Sigrid also sought to recover the money that Marleen had taken from Gardar's and Sigrid's personal accounts, rent and damages proceeds for the disputed equipment, and the $50,000 CRP payment.

¶22     The District Court issued findings of fact, conclusions of law, and an order on January 19, 2005. The District Court rescinded the 1992 stock transfer because the children had breached an equitable grantor-support agreement when they restricted

7

Gardar's and Sigrid's access to G&S corporate funds. The court found that Gardar and Sigrid had authorized Marleen's withdrawals of $66,000 and $55,000 to finalize the settlement with the H&J group. The court denied Gardar's and Sigrid's request that Marleen repay this money. The court concluded that Gardar and Sigrid had presented no credible evidence by which it could determine whether these withdrawals were intended to be loans, as Gardar and Sigrid maintained, rather than gifts, as asserted by Marleen. The court also found that Gardar and Sigrid had authorized Marleen to write the $35,000 check to Iceland Farms, but that the money constituted a loan and therefore Marleen had to repay the $35,000 to Gardar and Sigrid. The court rejected Gardar's and Sigrid's claim to rental and insurance proceeds on the disputed equipment. The court determined that G&S owned the disputed equipment at all relevant times. Finally, the court ordered the children to repay the $50,000 CRP payment because Gardar had revoked Marleen's authorization to change the named payee on the contract with the FSA.

## STANDARD OF REVIEW

¶23 We review a district court's findings of fact to determine whether those findings are clearly erroneous. *Bonnie M. Combs-DeMaio Liv. Trust v. Colony,* 2005 MT 71, ¶ 9, 326 Mont. 334, ¶ 9, 109 P.3d 252, ¶ 9. A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed. *Bonnie M. Combs-DeMaio Liv. Trust*, ¶ 9. We review a district court's conclusions of law for correctness. *Bonnie M. Combs-DeMaio Liv. Trust*, ¶ 9.

8

## DISCUSSION

## ISSUE ONE

¶24    *Whether the District Court correctly applied the grantor-support theory rather than the principles of contractual rescission set forth at § 28-2-1713, MCA?*

¶25    Montana long has recognized that equitable principles inapplicable to ordinary conveyances govern when elderly parents transfer property to their children in consideration for support and maintenance under so called grantor-support agreements. *De Atley v. Streit*, 81 Mont. 382, 389, 263 P. 967, 970 (1928).  Grantor-support agreements arise from the unique fiduciary duty children assume upon such a transfer. *De Atley*, 81 Mont. at 388, 263 P. at 970.  As a result, this Court is disinclined to apply strict rules of law to such agreements.  *De Atley*, 81 Mont. at 388, 263 P. at 970.  A court may rescind a grantor-support agreement on any number of grounds including, but not limited to, failure of consideration, fraud in the transaction, or breach of a condition subsequent.  *De Atley*, 81 Mont. at 387, 263 P. at 969-70.

¶26    The children challenge the District Court's decision to rescind the 1992 stock transfers because Gardar and Sigrid failed to comply with the statutory rules of contractual rescission set forth in § 28-2-1713, MCA.  As described in *De Atley*, however, strict rules of law do not apply to a rescission governed by the equitable principles of a grantor-support agreement.  *De Atley*, 81 Mont. at 388, 263 P. at 970.  We cannot simultaneously apply the equitable principles of the grantor-support theory of rescission and the formalities of the contractual rescission statute.  If we were to hold that § 28-2-1713, MCA, applies here, then we would have to extinguish the grantor-support

9

theory of rescission and replace it with the formalities of the contractual rescission statute. Such an outcome would conflict with our precedent. *See e.g.*, *Sands v. Nesteguard*, 198 Mont. 421, 427, 646 P.2d 1189, 1192 (1982) (recognizing the continuing validity of the *De Atley* theory of equitable rescission). The District Court was correct in deciding that the formalities of § 28-2-1713, MCA, do not apply to the unique facts of this case.

¶27 We might agree with the children if they had argued that, as a matter of equity, the District Court should have required Gardar and Sigrid to restore some or all of the value that they received from the children under the grantor-support agreement. *De Atley*, 81 Mont. at 387, 263 P. at 971. The children arguably raised this issue in pre-trial arguments before the court regarding whether Gardar and Sigrid could proceed to trial under the grantor-support theory; however, the children offered no evidence at trial to substantiate any claim that this rescission would inequitably deprive them of value that they had transferred to Gardar and Sigrid under the grantor-support agreement. Thus, we cannot hold that the District Court abused its equitable discretion in light of the record before us. *De Atley*, 81 Mont. at 392, 263 P. at 971-72.

¶28 The children allege next that the grantor-support theory of rescission developed in *De Atley* is inapplicable here because Sigrid and Gardar had other means of support and were not under hardship. The children's focus on the relative means and hardship of Gardar and Sigrid is misplaced. The fiduciary duty of support that children assume upon receipt of their parents' assets represents the primary principle underlying the equitable doctrine of grantor-support agreements. *De Atley*, 81 Mont. at 388, 263 P. at 970. The

10

parents' relative means or hardship represents only one of many considerations the court may choose to weigh in its discretion. *De Atley*, 81 Mont. at 387, 263 P. at 969-70.

¶29 Here the District Court found a grantor-support agreement based upon Gardar's and Sigrid's decision to transfer stock to their children with the understanding that G&S would continue to support them, as it always had, regardless of Gardar's and Sigrid's other means. The children's breach of their duty triggered the rescission, not Gardar's and Sigrid's relative means or hardship. *De Atley*, 81 Mont. at 388, 263 P. at 970. The court correctly applied the grantor-support theory under these circumstances.

## ISSUE TWO

¶30 *Whether the District Court correctly determined that the children breached the grantor-support agreement?*

¶31 The children also allege that the District Court erred in determining that they breached the grantor-support agreement. We disagree. The District Court found that by 1999, the children effectively had excluded Gardar from decision making at G&S. The District Court also found that Marleen, Marie, and Evelyn, exercising their corporate majority, restricted Gardar's and Sigrid's traditional uses of corporate funds for their living expenses. In October 2000, Marleen, Marie, and Evelyn closed the corporate checking account without notice to their parents. This closure halted the payment of Gardar's and Sigrid's health insurance premiums. Sigrid and Gardar no longer could write corporate checks. Instead they had to submit receipts to the corporation for approval and reimbursement or buy items through charge accounts that were billed directly to the corporation. The corporation refused to reimburse Gardar and Sigrid for

11

their assisted living, and cut off their long distance telephone line. In light of this evidence, the District Court correctly determined that the children materially had breached the grantor-support agreement. *See Bonnie M. Combs-DeMaio Liv. Trust*, ¶ 9.

## ISSUE THREE

¶32 *Whether the District Court abused its discretion in allowing Gardar and Sigrid to proceed to trial claiming breach of a grantor-support agreement?*

¶33 A district court possesses wide discretion in deciding whether to allow a party to raise a factual issue or legal theory not explicitly raised in the pretrial order, but the court must be mindful not to prejudice the parties. *Nentwig v. United Industry, Inc.*, 256 Mont. 134, 139, 845 P.2d 99, 103 (1992). The pretrial order should be construed liberally, but the theory or issue must be included, at least implicitly, in the pretrial order. *Nentwig*, 256 Mont. at 139, 845 P.2d at 102.

¶34 The children argue that the District Court abused its discretion by allowing Gardar and Sigrid to proceed to trial on a grantor-support theory when Gardar and Sigrid had failed to include this theory in the Pretrial Order. Gardar and Sigrid counter that, regardless of the name, the theory always had been the same: Gardar and Sigrid transferred G&S stock to their children subject to two conditions, and the children breached those conditions. We agree.

¶35 As discussed above, a grantor-support agreement is implied where parents transfer assets to their children in consideration for support. *De Atley*, 81 Mont. at 389, 263 P. at 970. Gardar and Sigrid set forth the elements of the grantor-support agreement in the Pretrial Order. The Pretrial Order states that Gardar and Sigrid transferred their shares of

12

G&S stock to their children as long as the children would (1) continue to involve Gardar in decision making at G&S, and (2) continue to meet Gardar's and Sigrid's physical and financial needs. Gardar and Sigrid also allege in the Pretrial Order that the children have jointly and severally breached these conditions. As a result, the grantor-support theory was at least implicit in the Pretrial Order. *See Nentwig*, 256 Mont. at 139, 845 P.2d at 102. The District Court did not abuse its discretion in allowing Gardar and Sigrid to proceed to trial on the grantor-support theory.

## ISSUE FOUR

¶36 *Whether the District Court abused its discretion in finding that the $35,000 check to capitalize Iceland Farms was a loan and therefore not subject to the two-year statute of limitations for injuries involving property?*

¶37 Appellant Iceland Farms (the children's operating partnership) contends that the two-year statute of limitations on injuries to property set forth in § 27-2-207, MCA, barred Gardar's and Sigrid's claim for the $35,000 check that Marleen wrote to capitalize the Iceland Farms partnership. Iceland Farms points to the fact that Gardar and Sigrid alleged in their complaint that Marleen wrongfully had converted the $35,000 in June of 1998, but did not seek relief from Iceland Farms until July of 2000. Thus, they argue that the two-year statute of limitations had lapsed with respect to Iceland Farms. The District Court determined, however, that the statute of limitations did not bar the claim because the pleadings should be amended to conform to the evidence. The District Court relied upon the fact that two separate writings admitted at trial indicated that the parties intended the $35,000 check to be a loan.

13

¶38	Rule 15(b) of the Montana Rules of Civil Procedure provides that issues not raised by the pleadings may be tried by the express or implied consent of the parties. *Armbrust v. York*, 2003 MT 36, ¶ 13, 314 Mont. 260, ¶ 13, 65 P.3d 239, ¶ 13. A party impliedly consents to try an issue not raised in the pleadings where the party fails to object to the introduction of evidence relating to that issue. *Armbrust*, ¶ 16. The trial court exercises its discretion when deciding whether to allow such amendments. *Armbrust*, ¶ 13.

¶39	Gardar and Sigrid offered substantial testimony and exhibits that tended to prove that the parties intended the $35,000 check to be a loan. The children did not object to any of this evidence on grounds that it was outside the scope of the issues to be tried. For example, the children did not object when Jon and Marleen both testified to the fact that the $35,000 check was a loan. The children also did not object when Gardar and Sigrid moved to enter a letter from Gardar that characterized the $35,000 check as an "operating loan [Marleen, Marie, Evelyn, and Jon] took last June" that needed to be "pay[ed] back." The children did object when Gardar and Sigrid moved to enter an accounting report that characterized the $35,000 as a loan. The children only "request[ed] foundation for that one," however, and they did not object that the accounting report fell outside the scope of the issues to be tried.

¶40	The children's failure to object to evidence indicating that the $35,000 check constituted a loan implies their consent to include this issue in the matters to be resolved at trial. *Armbrust*, ¶ 16. The District Court did not abuse its discretion in finding the parties implicitly agreed to try the issue of whether the $35,000 was intended to be a loan. *Armbrust*, ¶ 13.

14

**ISSUE FIVE**

¶41 *Whether substantial evidence supports the District Court's finding that Marleen possessed authority to withdraw $66,000 and $55,000 from Gardar's and Sigrid's personal accounts?*

¶42 Gardar and Sigrid cross appeal the District Court's finding that Marleen possessed authority to withdraw the $66,000 and $55,000 closing payments from Gardar's and Sigrid's personal accounts. Gardar and Sigrid claim that Jon did not authorize the withdrawals, and that, in any event, Gardar did not give Jon authority to do so.

¶43 The children presented substantial evidence that Jon had the authority to authorize Marleen to make the withdrawals. Jon testified that he was president of G&S, and that Gardar gave him the power and authority to effectuate the closing of the multimillion-dollar settlement with H&J. Marleen, Marie, and Evelyn each testified that Jon, on behalf of Gardar, authorized Marleen to withdraw the funds. Marleen testified that soon after she withdrew the closing funds she disseminated time sheets to all the members of G&S and Iceland Farms, including Jon, describing these withdrawals in detail. Jon testified that he was aware that the closing would transfer money from G&S to H&J, and that he had signed the papers consummating the deal. Based on this testimony, the District Court justifiably inferred that Jon must have been aware that Marleen withdrew the money, and that he authorized her to do so.

¶44 Moreover, Jon helped Gardar write a letter to Iceland Farms that characterized the $35,000 check as an "operating loan [Marleen, Marie, Evelyn, and Jon] took last June" that needed to be "pay[ed] back." Gardar and Jon wrote this letter almost one year after

15

Jon should have been aware of Marleen's withdrawal of the $66,000 and $55,000 closing payments. Yet, nowhere in Gardar's letter to Iceland Farms does it state that Marleen did not have the authority to withdraw the $35,000, the $66,000 and $55,000, or any other money from Gardar's and Sigrid's personal accounts. Substantial evidence supports the District Court's finding that Jon properly authorized Marleen, on behalf of Gardar, to make withdrawals from Gardar's and Sigrid's personal accounts. *See Bonnie M. Combs-DeMaio Liv. Trust*, ¶ 9.

## ISSUE SIX

¶45 *Whether substantial evidence supports the District Court's finding that the children were not liable for the $66,000 and $55,000 withdrawals from Gardar's and Sigrid's personal accounts?*

¶46 Gardar and Sigrid next challenge the District Court's finding that the children are not liable for repaying the $66,000 and $55,000 withdrawals. The District Court decided not to hold the children liable because Gardar and Sigrid failed to present credible evidence that would allow the court to determine that these withdrawals were intended to be loans rather than gifts. Gardar and Sigrid argue on appeal that the court erred because similar evidence tends to prove that the parties intended that both the $35,000 check and the $66,000 and $55,000 withdrawals to be loans.

¶47 Gardar and Sigrid point to "page 4" of the G&S tax returns for years 1998 through 2002 and Marleen's testimony as evidence that the parties intended the withdrawals to be loans. Gardar and Sigrid argue that "[G&S's] accountant had placed the parents' loans on the tax returns for the corporation for numerous years." We see only two debts

16

indicated on "page 4" of the tax returns: a short term debt of $127,300.00 and a long term debt of $162,287.40. Neither of these figures readily correlates to the $66,000 withdrawal, the $55,000 withdrawal, or sum of the two.

¶48 Gardar and Sigrid further point to what can be described as equivocal testimony by Marleen regarding the status of the withdrawals. Marleen does admit that her accountant told her that "these moneys" were loans. It is not clear, however, that she is referring to the $66,000 and $55,000 withdrawals as opposed to the $35,000 check. On the other hand, the District Court found that an accounting report and Gardar's letter characterize the $35,000 check as a loan. *See supra*, ¶ 38. No such evidence suitably characterizes the closing payments as loans. Substantial credible evidence supports the District Court's finding that Gardar and Sigrid failed to present sufficient evidence by which it could determine that the $66,000 and $55,000 withdrawals were intended to be loans or gifts. *See Bonnie M. Combs-DeMaio Liv. Trust*, ¶ 9. Absent such evidence, the District Court correctly determined that the children cannot be held liable for repayment.

## ISSUE SEVEN

¶49 *Whether substantial evidence supports the District Court's finding that Marleen lacked authority to transfer the "named payee" of a Conservation Reservation Payment from G&S Land and Cattle to Iceland Farms?*

¶50 Robert Hermance, county executive director of FSA, provided undisputed testimony that Gardar revoked Marleen's power of attorney for FSA purposes. Hermance further testified that no child, including Marleen, had the authority to change the named payee in the CRP contract. The children do not point to any evidence in the

17

record that refutes Hermance's testimony. Substantial evidence supports the District Court's finding on this issue. *See Bonnie M. Combs-DeMaio Liv. Trust*, ¶ 9.

## ISSUE EIGHT

¶51 *Whether substantial evidence supports the District Court's finding that Gardar had no personal interest in the farm equipment in question?*

¶52 Gardar and Sigrid cross appeal the District Court's finding that Gardar had no personal interest in the disputed farm equipment. They allege that Gardar, as a partner in Hjartarson Farms, owned the disputed equipment individually and as a partner. The District Court found that G&S owned the disputed equipment at all times relevant. It determined that Gardar and Sigrid were not entitled, therefore, to rental or insurance proceeds.

¶53 The 1998 settlement agreement states that the equipment will be divided between the "H&J Group" and the "G&S Group" through mutual bills of sale. The settlement agreement does not specify how the equipment will be divided between the individuals, corporations, and partnerships that make up each group. The subsequent bills of sale, however, divided the disputed equipment solely between G&S corporation and H&J corporation.

¶54 Don Lee, counsel for the G&S group during the partition, testified that at the time of the settlement, he had never been aware that Gardar had, or claimed to have, a personal interest in any of the disputed equipment. Moreover, G&S insured and paid taxes on the disputed equipment. Substantial evidence supports the District Court's

18

finding that Gardar retained no personal interest in the disputed equipment following the 1998 settlement. *See Bonnie M. Combs-DeMaio Liv. Trust*, ¶ 9.

¶55   Affirmed.


/S/ BRIAN MORRIS


We Concur:


/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JIM RICE