FILED

07/08/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0656

DA 23-0656

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 150

SIDNEY and JULIAN HELVIK,

        Plaintiffs, Counter Defendants,
        and Appellees,

     v.

WESLEY and KAREN TUSCANO,

        Defendants, Counter-Plaintiffs,
        and Appellants,

WESLEY and KAREN TUSCANO,

        Third-Party Plaintiffs and Appellants,

     v.

JACQUELINE CONNER,

        Third-Party Defendant and Appellee.

APPEAL FROM:   District Court of the Sixth Judicial District,
                In and For the County of Sweet Grass, Cause No. DV 2021-39
                Honorable Brenda R. Gilbert, Presiding Judge

COUNSEL OF RECORD:

        For Appellants Wesley and Karen Tuscano:

                Hertha L. Lund, Peter B. Taylor, Lund Law, PLLC, Bozeman,
                Montana

        For Appellees Sidney and Julian Helvik:

                Barbara C. Harris, Attorney at Law, Helena, Montana

For Appellee Jacqueline Conner:

    Michael F. McGuinness, Justin M. Oliveira, Patten Peterman Bekkedahl & Green, PLLC, Billings, Montana

_____

Submitted on Briefs: June 18, 2025

Decided: July 8, 2025

Filed:

Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Wesley and Karen Tuscano ("Tuscanos") appeal from the Sixth Judicial District Court, Sweet Grass County's May 30, 2023 Decision and Order Regarding Third-Party Defendant's Motion for Summary Judgment ("Summary Judgment Order") granting Jacqueline Conner's motion for summary judgment on all claims against her; and October 11, 2023 Findings of Fact, Conclusions of Law, Final Order, and Judgment ("Judgment") granting Sidney and Julian Helvik ("Helviks") title to their family ranch.

¶2 We restate the issues on appeal as follows:

*Issue 1: Whether the District Court erred by exercising its equitable powers to rescind the Agreement between the Helviks and Tuscanos.*

*Issue 2: Whether the District Court abused its discretion when it prohibited the introduction of an oral agreement at trial.*

*Issue 3: Whether the District Court abused its discretion by excluding evidence regarding an Adult Protective Services Investigation.*

*Issue 4: Whether the Tuscanos preserved their argument that the jury was improperly instructed on the law of undue influence.*

*Issue 5: Whether the District Court erred by granting Jacqueline Conner's Motion for Summary Judgment as to the Tuscanos' tortious interference claim.*

*Issue 6: Whether Jacqueline Conner is entitled to attorney fees under M. R. App. P. 19(5).*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 This case concerns a ranch situated just off the highway west of Big Timber. The Helviks moved to the ranch with their family in 1947 when they were just boys. At that time, there were eight Helviks living and working at the ranch: two parents and six brothers,

3

of which Sidney and Julian were the youngest. From 1947 until the present, at least one Helvik has lived at the ranch, raising sheep and cattle, threshing grain, and tending to the family home. The Helviks' father passed away in 1962. Sidney married in 1982 and moved into town for a while, but he returned to the ranch every day to work with Julian, who remained in the home. The Helviks' mother passed away in 1984, and Sidney's wife passed away in 2004, after which Sidney moved back in with Julian, and they continued to tend to the ranch as they had since 1947.

¶4 Things took a turn for the worse in 2018 when Sidney slipped on a patch of ice while tending to the sheep and broke several bones in his right foot. As he was recovering, Sidney noticed that his older brother Julian was starting to succumb to Alzheimer's. Sidney, who was 80 at the time and undergoing treatment for prostate cancer, started to think about a future for the ranch without a Helvik for the first time since 1947. The Helviks sold their sheep and cattle that year.

¶5 It was at this time that Wesley Tuscano and his brother-in-law Jackson Gardner approached the Helviks about purchasing a portion of the ranch. Wesley and Karen's family had been the Helviks' neighbors for some time, had a ranch that neighbored the Helviks', and the two ranches had traded hay and leases over the years. Wesley and Gardner came to the Helviks' home and explained that they were interested in setting up a business, but that regulations in Big Timber were making it difficult to get going, so they were interested in buying a portion of the Helviks' ranch. The Helviks ultimately agreed

to sell a small portion of the ranch to CW Bar Machinery, LLC.[1]  In March of 2018, Wesley called the Helviks out to Sweet Grass Title Company in Big Timber to sign the sale agreement.  The Helviks took no part in the preparation of the agreement and were not represented or advised by any professionals as part of the transaction.  Still, Sidney considered the 2018 agreement a good deal and was content with the payment he and his brother received for the property.

¶6     Sidney had the remainder of the ranch appraised in 2019, as Julian's condition continued to deteriorate.  Julian would get out of bed in the middle of the night and wake Sidney, preventing Sidney from sleeping more than four hours a night most nights.  Sidney had to rush his brother to hospital on at least one occasion.  On April 8, 2019, Sidney gained Power of Attorney over Julian because Julian had not been paying his bills, and Sidney wanted to ensure that none of them went into default.  Wesley would visit the Helviks periodically, and Sidney told Wesley about Julian's deteriorating condition.

¶7     One winter day in 2019, Sidney went up to the attic to board up a window that had broken.  When he reached the attic, he slipped and broke his nose on a rafter.  He called Wesley for help.  While Wesley boarded up the window, Sidney reflected on this most recent reminder that he needed to plan for a future where he and his brother would no

---

[1] CW Bar Machinery is a business affiliated with the CW Bar Ranch.  The record is not clear on how or when CW Bar Machinery became involved in the 2018 transaction.  Wesley testified at trial that he was part of a joint venture with CW Bar Machinery, the terms of which were that CW Bar Machinery would put up the money for the land and be the official purchaser of the land, but that the land would be used to house Wesley and Gardner's business.  Sidney testified that he was unaware of the relationship between Wesley and CW Bar Machinery and thought that the actual purchaser ought to be the one he was negotiating with, but that he ultimately trusted Wesley enough to make the sale.

longer be able to live safely at the ranch. When Wesley came down from the attic, Sidney asked him whether he would be interested in buying the rest of the ranch. Wesley initially offered Sidney $600,000 before lowering the offer to $500,000.

¶8 On April 30, 2020, Wesley brought the Helviks a document titled Agreement to Sell and Purchase Real Property ("Agreement"). As with the 2018 sale, the Helviks took no part in the preparation of the Agreement and received no guidance from any professionals. The Agreement provided that the Tuscanos would execute a promissory note to the Helviks for $500,000 and make payments of $25,000 to the Helviks each year on July 1 and January 1 until either both of the Helviks passed away or the entire debt was paid. In exchange, the Helviks agreed to sign a quitclaim deed granting the entire ranch to the Tuscanos. The Agreement reserved a life estate for the Helviks in their home on the ranch but otherwise transferred the entirety of the ranch to the Tuscanos at closing. The Agreement contained a provision 10 entitled Other Assistance from BUYER to SELLER, which provided the following:

> The parties acknowledge that both Sidney Helvik and Julian Helvik are over 80 years of age and have no immediate family. As such, BUYER will assist SELLER with respect to end-of-life issues, including finding healthcare, tax preparation assistance, estate planning assistance and, if necessary, a place to live besides their home. BUYER, however, will not be responsible for payment of these items or any other day-to-day expenses. It is the intention of the parties that the SELLER will be able to pay for those items from the payments made by the BUYER set forth in Section 2, above.

Provision 24 of the Agreement mandated that all parties keep the Agreement confidential, a provision Wesley reinforced by reminding Sidney not to mention the Agreement to the

6

owner of CW Bar Machinery, LLC. The Helviks and Tuscanos both signed the Agreement that day.

¶9 The Helviks had several large agricultural implements on their property, which were not subject to the Agreement. After they signed the Agreement, the Tuscanos began using the Helviks' equipment before outright taking it. At one point, Wesley expressed interest in buying the equipment, but the Tuscanos never paid the Helviks any consideration for the equipment or its use. Sidney asked Wesley to return the equipment he had taken, but most of it was never returned.

¶10 On June 24, 2020—one week before the Tuscanos first payment under the Agreement was due—Wesley told Sidney to meet him at the Sweet Grass Title Company and to bring Julian. Wesley and Karen were both present. Wesley handed Sidney a document and instructed him and Julian to sign it. Sidney believed the document was the quitclaim deed he and Julian were supposed to sign under the Agreement. In reality, the document Sidney and Julian signed on June 24, 2020, was a gift deed ("Gift Deed"). The Gift Deed purported to transfer the entirety of the ranch to the Tuscanos without any consideration or reservation of a life estate. Sidney did not fully understand the implications of the Gift Deed but immediately felt uneasy after signing it. All he knew was that the Tuscanos were "supposed to take care of" him and Julian until they passed and pay them for the ranch. He trusted the Tuscanos to honor the Agreement based on the success of the 2018 agreement. He believed, in spite of his uneasiness, that signing the Gift Deed was a part of the Agreement.

¶11 On or about July 30, 2021, the Tuscanos used the Gift Deed to obtain a $402,206 mortgage, encumbering the Helviks' ranch. Despite encumbering the ranch with a mortgage, the Tuscanos never made a single payment to the Helviks.

¶12 In February of 2021, Sidney called his stepdaughter Jacqueline Conner and her husband Michael. Sidney told Michael that he had sold the ranch but that he had not received the money he was expecting from the sale. Jacqueline and Michael live in Columbus but visited the Helviks frequently. The Conners drove up to the ranch where they discovered what had happened when Sidney provided them with copies of the Agreement and the Gift Deed.

¶13 On October 15, 2021, the Helviks filed a Complaint in the District Court with the assistance of the Montana Legal Services Association. They alleged that both the Agreement and the Gift Deed were the result of undue influence and/or fraud or, in the alternative, that the Tuscanos had breached the terms of the Agreement. The Helviks sought a declaration that both documents were either void or rescinded and a declaration that the ranch belonged to them.

¶14 On June 15, 2022, after the parties had exchanged several rounds of amended complaints, answers, counterclaims, and discovery requests and responses, the Tuscanos filed a Third-Party Complaint naming Jacqueline as a Third-Party Defendant. The Tuscanos alleged that Sidney had written a new will on December 6, 2021, which "contemplate[d] selling the Ranch if the lawsuit against [the] Tuscanos is successful" and granted Jacqueline "20% of the proceeds from selling the Ranch." The Tuscanos asserted claims of tortious interference with contract and abuse of process against Jacqueline, based

8

on their allegations that she had caused the Helviks to file their suit in order to profit from the subsequent sale of the ranch.

¶15 On December 28, 2022, Jacqueline moved for summary judgment on both of the Tuscanos' claims against her. The District Court granted summary judgment in Jacqueline's favor on May 30, 2023. With respect to the claim for tortious interference, the District Court determined that the Tuscanos had not sufficiently alleged a contract with which Jacqueline could have interfered and had "wholly failed to produce any evidence of damages as required by the fourth factor of the tortious interference test."

¶16 On May 1, 2023, the Helviks filed two motions in limine. The first sought to exclude all evidence from trial of an Adult Protective Services ("APS") investigation the Montana Department of Health and Human Services had conducted in February of 2021 into allegations of potential abuse or exploitation of the Helviks. The District Court granted that motion on May 30, 2023, determining that the investigation and any resulting reports were not relevant to any claims remaining in the case because the investigation was conducted several months after the documents at issue were signed. The Helviks' second motion in limine sought to exclude all "evidence regarding any 'agreement' to transfer property after April 30, 2020." The District Court also granted that motion on May 30, 2023, determining that the statute of frauds would bar the admission of any evidence of an oral agreement to transfer land. The District Court clarified in a subsequent order issued June 6, 2023, that the Tuscanos were "not precluded from asserting facts to defend the claims of Undue Influence and Fraud," but only had to "refrain from referencing any agreement to defend such claims."

¶17 On June 12, 2023, the first day of trial, the District Court held a pretrial conference, at which it determined that "following the jury trial, further consideration of the Plaintiffs' claims for declaratory relief and quiet title would be necessary." The District Court held a jury trial from June 12, 2023, through June 15, 2023, on the remaining claims and counterclaims between the Helviks and the Tuscanos. By the time of the trial, Julian's Alzheimer's had progressed to the point that he was living at an assisted living facility and was unable to testify. In addition to Sidney, Jacqueline, and several other witnesses, Wesley testified that it was his belief that the Agreement had never been executed because there had never been a closing. Wesley testified that although he felt he was not bound by the terms of the Agreement, he intended to make payments to the Helviks as required by the Agreement, even though he had taken out a $402,206 mortgage on the ranch and yet still had never made a single payment in the three years since signing the Agreement. He also testified to conversations with Sidney and Julian between April 30, 2020, and June 24, 2020. At the conclusion of trial, the District Court settled jury instructions with the parties, and the parties stipulated to the instructions that were given to the jury.

¶18 The jury found that while the Agreement was valid and binding, the Tuscanos had breached the Agreement by failing to make any payments to the Helviks. The jury found that the Gift Deed was invalid because it was the result of undue influence. The jury determined that the Helviks had been injured in the amount of $150,000, which was based on "[t]he six missed payments, $25,000 each, since July 2020."

¶19 Both parties submitted post-trial proposed Findings of Fact and Conclusions of Law, after which the District Court issued its Judgment. In its Judgment, the District Court

10

concluded that the Helviks were entitled to a rescission of the Agreement on several grounds, including their entitlement to rescission "as a matter of equity." Having determined that rescission was the appropriate remedy, the District Court held that the Helviks were not entitled to money damages and vacated the $150,000 damages the jury had awarded to the Helviks for the three years the Tuscanos had maintained possession of the land without making any payments. Finally, the District Court ruled in favor of the Helviks' quiet title claim and quieted titled of the ranch in favor of the Helviks.

## STANDARDS OF REVIEW

¶20 We review a district court's findings of fact to determine whether those findings are clearly erroneous, and we review a district court's conclusions of law for correctness. *Hjartarson v. Hjartarson*, 2006 MT 273, ¶ 23, 334 Mont. 212, 147 P.3d 164. This Court has adopted the doctrine of implied findings for the purpose of reviewing findings of fact. *Hughes v. Hughes*, 2013 MT 176, ¶ 30, 370 Mont. 499, 305 P.3d 772. Where "findings are general in terms, any findings not specifically made, but necessary to the determination are deemed to have been implied, if supported by the evidence." *Hughes*, ¶ 30.

¶21 District courts have broad discretion to determine whether or not evidence is relevant and admissible pursuant to the Montana Rules of Evidence. Absent a showing of an abuse of discretion, the trial court's determination will not be overturned. *Vincelette v. Metropolitan Life Ins. Co.*, 1998 MT 259, ¶ 12, 291 Mont. 261, 968 P.2d 275.

¶22 We review a district court's ruling on summary judgment de novo for compliance with M. R. Civ. P. 56(c). *Seipel v. Olympic Coast Invs.*, 2008 MT 237, ¶ 9, 344 Mont. 415, 188 P.3d 1027. Summary judgment is proper only "if the pleadings, the discovery and

11

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3).

**DISCUSSION**

¶23    *Issue 1: Whether the District Court erred by exercising its equitable powers to rescind the Agreement.*

¶24    Despite having maintained throughout the District Court proceedings that the Agreement was invalid, the Tuscanos now argue on appeal that the District Court erred by rescinding the Agreement pursuant to its equitable powers because the jury had found that there were adequate remedies at law.[2]  In support of its equitable rescission, the District Court cited *Renz v. Everett-Martin*, 2019 MT 251, 397 Mont. 398, 450 P.3d 892.  The Tuscanos address *Renz* directly in their briefing on appeal, asserting that it actually stands for the proposition that "when a party is seeking to enforce a legal interest in real property, then [an equitable] remedy is not available unless facts and circumstances indicate that the party's legal remedies . . . are inadequate." *Renz*, ¶ 17 (quoting *Jeppeson v. Dep't of State Lands*, 205 Mont. 282, 287, 667 P.2d 428, 430-31 (1983)).

¶25    But the Tuscanos miss the District Court's more fundamental point that the history of property law in this country and state is long and filled with equitable exceptions to general rules.  *See Renz*, ¶ 17 (collecting citations).  In *Hjartarson*, this Court reaffirmed

---

[2] The Tuscanos also raise arguments against the District Court's other grounds for rescinding the Agreement.  Because we hold that the District Court properly exercised its equitable powers to rescind the contract, we need not consider these parallel arguments.

one such exception: the doctrine of equitable rescission in the context of grantor-support agreements. *Hjartarson*, ¶ 25. We held in *Hjartarson* that "[a] court may rescind a grantor-support agreement on any number of grounds including, but not limited to, failure of consideration, fraud in the transaction, or breach of a condition subsequent." *Hjartarson*, ¶ 25 (citing *De Atley v. Streit*, 81 Mont. 382, 387, 263 P. 967, 969-70 (1928)). "Grantor support agreements arise from the unique fiduciary duty [the supporting party] assume[s] upon such a transfer." *Hjartarson*, ¶ 25. "As a result, this Court is disinclined to apply strict rules of law to such agreements," including rules regarding the availability of equitable remedies. *Hjartarson*, ¶ 25.

¶26 A grantor-support agreement is one under which "people who are old and infirm convey[] their property to their children, or to others in whom they have trust and confidence, where the consideration for the conveyance is, in whole or in part, an agreement for future support and maintenance." *De Atley*, 81 Mont. at 388, 263 P. at 970 (quoting *Gustin v. Crockett*, 97 P. 1091, 1092 (Wash. 1908)). The jury's finding that the Agreement was binding on the parties necessarily included a determination that the Tuscanos were required to provide "future support and maintenance" to the aging Helviks pursuant to provision 10 of the Agreement. That provision not only required the Tuscanos to make timely payments to the Helviks—which they failed to do—but recognizing the Helviks "are over 80 years of age and have no immediate family," also required the Tuscanos to "assist [the Helviks] with respect to end-of-life issues, including finding healthcare, tax preparation assistance, estate planning assistance and, if necessary, a place to live besides their home"—which they also failed to do. The jury found that the Tuscanos

13

breached the Agreement, leaving the Helviks without the means to provide for much needed healthcare or plan for their futures. The District Court correctly determined that it had the ability to rescind the Agreement pursuant to its equitable powers and place the ranch back in control of the Helviks, unencumbered by the Tuscanos' mortgage they obtained with a gift deed the jury found to be the result of undue influence.

¶27    *Issue 2: Whether the District Court abused its discretion when it prohibited the introduction of an oral agreement at trial.*

¶28    The Tuscanos argue that the District Court abused its discretion when it granted the Helviks' second motion in limine and prohibited the introduction of any oral agreement to transfer land. As the Tuscanos acknowledge, the Statute of Frauds bars the introduction of extrinsic evidence of "an agreement . . . for the sale of real property or of an interest in real property." Section 28-2-903(1)(d), (2), MCA. They nevertheless assert that they should have been permitted to introduce evidence of discussions that took place between April 30, 2020, and June 24, 2020, to refute the Helviks' argument that the Gift Deed was the result of undue influence, citing § 28-2-905(1)(b), MCA. Section 28-2-905(1)(b), MCA, allows the introduction of extrinsic evidence of a written agreement "when the validity of the agreement is the fact in dispute." *See also Thornton v. Songstad*, 263 Mont. 390, 397, 868 P.2d 633, 637 (1994) ("Where the validity of the agreement is the fact in dispute, parol evidence is admissible, not to vary the terms of the instrument, but to show that what appears on its face as a valid, binding contract is, in fact, no such thing.") (quotation omitted).

14

¶29 There is no question that the Helviks put the validity of a written agreement, the Gift Deed, in dispute. But the District Court did not bar the Tuscanos from introducing extrinsic evidence of the validity of that agreement. The District Court's June 6, 2023, order clarifying its ruling on the motion in limine made clear that the Tuscanos were entitled to introduce evidence of negotiations leading up to the Gift Deed, the *written* agreement at issue. The only evidence that the Tuscanos could not introduce was evidence of an *oral* agreement, which is not permitted by § 28-2-905(1)(b), MCA. Nor do the Tuscanos point to any instance during the trial when the District Court prevented them from introducing evidence of the validity of the Gift Deed. The District Court did not abuse its discretion by granting the Helviks' second motion in limine.

¶30 *Issue 3: Whether the District Court abused its discretion by excluding evidence regarding an Adult Protective Services Investigation.*

¶31 The Tuscanos also argue that the District Court should have permitted them to introduce evidence at trial regarding an APS investigation that took place in February of 2021. The District Court ruled the investigation and its results were inadmissible because they were irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. Generally, all relevant evidence is admissible and all irrelevant evidence is not. M. R. Evid. 402. In *Vincelette*, we concluded that a district court did not abuse its discretion when it excluded photos of a hotel carpet as irrelevant because the photos were taken seven years after the alleged accident and did not depict the defects alleged by the plaintiff. *Vincelette*, ¶ 30.

15

¶32 The Tuscanos argue that evidence of the APS investigation was relevant to their defense against the Helviks' claims of undue influence because the investigating officer could speak to Sidney's state of mind and ability to be influenced. Though shorter than the seven years in *Vincelette*, the District Court in this case noted that any opinions the investigating officer formed about Sidney's mental state were formed over seven months *after* the Gift Deed was signed. The District Court noted that the investigating officer could only speak to Sidney's ability to follow her interview questions and she explicitly stated that she could not "determine capacity" to contract because that was not the role of APS. The District Court did not abuse its discretion when it ruled that evidence of the APS investigation was irrelevant and, therefore, inadmissible.

¶33 *Issue 4: Whether the Tuscanos preserved their argument that the jury was improperly instructed on the law of undue influence.*

¶34 The Tuscanos argue that the jury was not properly instructed on the law of undue influence because the jury instructions did not contain the elements of undue influence. The Helviks respond that the Tuscanos did not object to the jury instructions at trial and actually advocated for the undue influence instructions that were ultimately given. We will not review a claimed error in a jury instruction absent a specific objection before the trial court. *Nott v. Booke*, 194 Mont. 251, 255, 633 P.2d 678, 680 (1981). Because the Tuscanos did not object to the undue influence instructions before the District Court, they have waived the argument that the instructions were deficient. We therefore decline to consider their argument.

16

¶35     *Issue 5: Whether the District Court erred by granting Jacqueline Conner's Motion for Summary Judgment as to the Tuscanos' tortious interference claim.*

¶36     The Tuscanos argue that the District Court erred by granting Jacqueline's Motion for Summary Judgment on their claim of tortious interference because it based its ruling on its determination that there was no contract with which Jacqueline could have interfered, which the jury later determined was untrue.[3]  Jacqueline responds that the District Court also rested its summary judgment ruling on the Tuscanos' failure to allege damages that resulted from her alleged interference, so even though the Agreement was a binding contract, the District Court still correctly granted summary judgment based on the damages element.  In order to establish a claim of tortious interference with a contract, a claimant must prove the defendant's acts:

> 1) were intentional and willful; 2) were calculated to cause damage to the plaintiff in his or her business; 3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and 4) that actual damages and loss resulted.

*Emmerson v. Walker*, 2010 MT 167, ¶ 23, 357 Mont. 166, 236 P.3d 598.  "Because the elements are written in the conjunctive, each must be satisfied." *Seipel*, ¶ 11.  To survive a motion for summary judgment, a plaintiff must raise a genuine issue of material fact as

---

[3] The Tuscanos also raise an argument in a heading in their opening brief that the District Court erred by granting Jacqueline summary judgment on their claim of abuse of process, but they make no argument along those lines in the body of their opening brief and appear to admit in their reply brief that they have waived that argument by failing to address it.  "As we have stated on numerous occasions,  . . . we are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop legal analysis that may lend support to his position." *McCulley v. Am. Land Title Co.*, 2013 MT 89, ¶ 20, 369 Mont. 433, 300 P.3d 679.  Because the Tuscanos do not develop their abuse of process argument beyond a heading, we decline to consider it.

to *each* element of a conjunctive claim. *Seipel*, ¶ 11. The Tuscanos advance no argument on appeal that the District Court erred by holding they failed to raise a sufficient allegation of damages to satisfy the fourth element of their tortious interference claim. We therefore conclude that the District Court did not err by granting Jacqueline summary judgment on that claim.

¶37 *Issue 6: Whether Jacqueline Conner is entitled to attorney fees under M. R. App. P. 19(5).*

¶38 In her response brief, Jacqueline argues that we should award her attorney fees as a sanction for the "Tuscanos' non-meritorious appeal" under M. R. App. P. 19. We will award attorney fees under M. R. App. P. 19(5) if the appellant's claims for relief are "frivolous, vexatious, filed for purposes of harassment or delay, or taken without substantial reasonable grounds." *Rintoul v. Rintoul*, 2014 MT 210, ¶ 19, 376 Mont. 167, 330 P.3d 1203. However, "[t]his Court does not readily impose sanctions for filing frivolous appeals. As a general rule, we impose sanctions in cases only where the appeal is entirely unfounded and intended to cause delay, or where counsel's actions otherwise constitute an abuse of the judicial system." *Rintoul*, ¶ 19 (quoting *Bi-Lo Foods, Inc. v. Alpine Bank*, 1998 MT 40, ¶ 36, 287 Mont. 367, 955 P.2d 154). In *Rintoul*, we declined to award sanctions against an appellant because the "case itself provided a reasonable basis to challenge the District Court's application of" existing caselaw, but "the manner in which the case was argued very nearly moved our discretion to impose sanctions." *Rintoul*, ¶ 21. In this case, the Tuscanos had a reasonable basis on which to appeal the District Court's summary judgment ruling in Jacqueline's favor because of the jury's subsequent finding

18

that there was indeed a binding contract in the form of the Agreement. For that reason, we decline to award sanctions, notwithstanding the Tuscanos' failure to address the alternative grounds on which the District Court granted Jacqueline's summary judgment motion.

## CONCLUSION

¶39    The District Court did not err when it exercised its equitable powers to rescind the Agreement and quieted titled of the ranch in favor of the Helviks. The District Court did not abuse its discretion when it granted either of the Helviks' motions in limine. The Tuscanos failed to preserve their argument for appeal that the jury was not properly instructed on the elements of undue influence. The District Court did not err when it granted summary judgment in Jacqueline's favor. We decline to award Jacqueline sanctions pursuant to M. R. App. P. 19(5). The District Court's orders and judgments are affirmed.

/S/ JAMES JEREMIAH SHEA


We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M BIDEGARAY
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

19